# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

VINCENT P. LUJAN,       )
                       )
        Plaintiff,      )
                       )
        v.          )     **Case No. 3:07-0975**
                       )     **Judge Echols**
SOUTHWEST AIRLINES CO.,  )
                       )
        Defendant.    )

## MEMORANDUM

Plaintiff, a Hispanic of Spanish national origin, brings this employment discrimination case against his former employer Southwest Airlines Company ("Southwest"). Southwest has filed a Motion for Summary Judgment (Docket Entry No. 9), to which Plaintiff has responded in opposition (Docket Entry No. 16) and Southwest has replied (Docket Entry No. 18). Southwest has also filed a Motion to Strike Plaintiff's Affidavit (Docket Entry No. 20), to which Plaintiff has responded in opposition (Docket Entry No. 22).

## I. FACTUAL BACKGROUND

This lawsuit arises out of events which occurred while Plaintiff was employed by Southwest at its Nashville International Airport ("BNA") station. To place the parties' arguments on Defendant's Motion for Summary Judgment in perspective, the Court will begin its review of the facts by giving a brief overview of Southwest's general employment policies. The Court will then set forth the facts as they relate to Plaintiff's transfer to Nashville and his subsequent efforts to transfer elsewhere. The Court will next discuss the specific complaints Plaintiff has about his

treatment while he was employed by Southwest in Nashville. Finally, the Court will set forth the procedural background of this case since it relates to the timeliness of Plaintiff's claims.

**A. General Employment Policies and Practices at Southwest**

Southwest utilizes certain procedures in regard to transfers and promotions. As a general rule, an individual must be in his or her current position for one year before he or she will be considered for positions at other stations. Exceptions are made when it is in Southwest's interest to transfer or promote an employee to a position at another station.

In order to be promoted to an available position, Southwest employees must complete and submit an Internal Placement Application ("IPA"). Typically, the candidate will also submit his or her latest performance evaluation and/or resume with the IPA. The employee's Station Manager or supervisor must review the IPA and indicate his or her approval before an employee will be considered for the promotion. Candidates who submit completed and approved IPAs are generally interviewed by the manager who posted the position, along with a recruiter from Southwest's People and Leadership Development Department.

Southwest has Manager in Training ("MIT") programs for its employees. The purpose of the MIT programs is to provide training to employees for future management positions within the company.

Southwest has a policy prohibiting discrimination and harassment of its employees. Southwest managers receive annual training regarding this policy.

**B. Plaintiff's Transfer to Nashville and Attempts to Leave Nashville**

Plaintiff began his employment with Southwest on June 10, 1988, as a Ramp Agent at the Albuquerque ("ABQ") station. He was employed by Defendant as an Operations Supervisor at

2

ABQ in 2003 when the Nashville station posted an opening for the position of Assistant Manager of Ramp and Operations ("AMRO").

Plaintiff submitted an IPA for the AMRO position at BNA. Plaintiff was not alone in applying for the position, as there were many candidates, including one other internal candidate. Other than Plaintiff, none of the applicants was Hispanic.

Plaintiff was interviewed for the position by BNA Station Manager Dave Yarbrough ("Yarbrough") and the Manager of Ramp and Operations ("MRO") Brian Davis ("Davis"). After the interview, Davis selected Plaintiff for the position and Yarbrough concurred in that decision.

Effective December 1, 2003, Plaintiff was promoted to the AMRO position at BNA.[1] Plaintiff became the most junior member of Southwest's BNA management and reported to Davis who in turn reported to Yarbrough. Also in management at BNA at the time was Laura Sullivan ("Sullivan"), Manager of Customer Service, who reported to Yarbrough. Mandi Venable ("Venable") was the Assistant Manager of Customer Service and she reported to Sullivan.

While in his AMRO position, Plaintiff participated in Southwest's MIT program I, graduating in August 2004. Plaintiff then completed an application to enroll in MIT II which Yarbrough signed on August 5, 2004. Yarbrough supported Plaintiff's participation in MIT II,[2] and Plaintiff graduated from MIT II in or about October 2005.

---

[1] Defendant claims this was Plaintiff's first management position. However, Plaintiff asserts he was a supervisor while in Albuquerque and Las Vegas and he was told on several occasions a supervisor was a part of management.

[2] MIT II was a six month program that required Plaintiff to be away from BNA for 1 full week each month to attend training in Dallas, Texas.

3

On October 7, 2004, Plaintiff received an evaluation for his performance as AMRO. On the evaluation, which Davis filled out and Yarbrough approved, Plaintiff received a total score of 3.5 out of a possible 5.0. Plaintiff was pleased with this evaluation.

Nevertheless, Plaintiff voiced complaints to Yarbrough about Davis, and in particular his view that Davis was spending money for things which were not necessary, Davis did not hold his employees accountable for their actions, Davis lied about actions he had taken, and Davis would confront Plaintiff. Plaintiff claims Yarbrough never adequately addressed these issues and left it to Plaintiff to change Davis' ways. Plaintiff asserts he was so disenchanted with the environment at BNA he began looking elsewhere for employment with Southwest.

From 2004 to December 2005, Plaintiff applied for several different promotions at Southwest, all at stations other than BNA. Yarbrough signed every IPA that Plaintiff brought to him during this period of time.

Nevertheless, Plaintiff does not believe Yarbrough fully supported Plaintiff in his promotion requests because, although Yarbrough signed the IPAs, he did not make contact with other station managers and endorse Plaintiff, or tell Plaintiff that he was supporting him in his applications for other positions. Plaintiff has no personal knowledge whether Yarbrough ever made any calls or submitted any letters on behalf of subordinates seeking promotion, except for one occasion when he made a call on Plaintiff's behalf.

Yarbrough told Plaintiff he needed him at BNA because he (Yarbrough) was selfish and Plaintiff was an excellent worker. Plaintiff did not take this as a compliment because he felt Yarbrough liked to exercise control over him, even though Yarbrough never made any statements

about wanting to control Plaintiff. Plaintiff also believed Yarbrough was offended because Plaintiff did not want to continue working for him, but instead wanted to transfer elsewhere.

In mid-2005, temporary manager positions were open at Southwest's Philadelphia ("PHL") station. Southwest claims Yarbrough spoke with Southwest Regional Director Jeanne Frantell at Plaintiff's request about Plaintiff taking a Customer Service Manager position at PHL and she agreed to it. Plaintiff claims PHL was in desperate need of help and was viewed as a station which was "tough" and experiencing growing pains. Regardless of how it came about, Plaintiff began working a two month temporary assignment as a Customer Service Manager at PHL in July 2005. While Plaintiff admits the position at PHL was a good opportunity to get his name and face known elsewhere and provided him with experience at another station which would help him later down the road, Plaintiff claims he took the temporary assignment to get away from Yarbrough.

In November 2005, Davis left his position as MRO at BNA to take a promotion as Station Manager in Norfolk, Virginia. While Yarbrough could have posted the open MRO position, he chose not to do so. The parties dispute whether Yarbrough considered only Plaintiff for the position, with Plaintiff claiming that Yarbrough considered Ricky Justice, who also worked at BNA, for the promotion. Regardless, Plaintiff was promoted to the position effective January 1, 2006, and he received a pay increase and stock options.[3]

------

[3]In fact, Plaintiff received pay increases throughout his employment at BNA. When Plaintiff first transferred to the AMRO position at BNA, his salary was increased to $58,114.08, which was bumped to $60,438.60 on April 1, 2004 and to $60,802.56 on May 16, 2004. On April 1, 2005, Plaintiff received a pay increase to $63,234.72 which was increased to $63,528.24 effective December 1, 2005. When Plaintiff was promoted to the MRO position effective January 1, 2006, his pay was increased to $67,975.20.

By this time, the hierarchy at Southwest's BNA station had changed. While Yarbrough was still Station Manager, Venable had been promoted to Assistant Station Manager and reported directly to Yarbrough, as did Sullivan, who was still Customer Service Manager. With his promotion to MRO, Plaintiff reported directly to Yarbrough. The Assistant Customer Service Manager and AMRO position had by now been eliminated.[4]

Upon taking the MRO position, Plaintiff believed he should have had the same schedule as his predecessor Davis. However, when Plaintiff was promoted to the position, he retained his existing work schedule. Southwest claims this was because Sullivan was on maternity leave and Southwest wanted a manager at BNA at all times. Plaintiff disputes this claiming, at least from the time he left at 7:30 p.m. until closing at approximately midnight, there was no manager on the premises, and Yarbrough told him that his shift schedule was not going to be adjusted, even after Sullivan returned from leave.

After Plaintiff's promotion to the MRO position at BNA, some of the supervisors complained to Yarbrough and Venable that Plaintiff was mistreating them, including getting in their faces behind closed doors, pointing his finger in their faces, threatening their jobs, and giving them evil looks. Plaintiff claims no mistreatment occurred. Instead, certain supervisors were upset because for the first time they were being held accountable for their actions.

During this period, Plaintiff continued to look for positions at other Southwest stations. On February 23, 2006, Plaintiff was interviewed for the Station Manager position at ABQ. One other

_____

[4]Southwest claims the decision to eliminate the AMRO position was made by Yarbrough and Regional Director Mike Miller as a way to eliminate management positions through attrition as was occurring at other stations. Plaintiff claims that Yarbrough was solely responsible for the decision and, unlike other stations, there was no decline in the passenger loads at BNA.

6

person applied for that position, but the decisionmaker determined that neither applicant had sufficient experience to manage a station as large as ABQ and instead the Boise station manager was asked to transfer to ABQ, which he did.

On March 7, 2006, Plaintiff was interviewed for the Center Leader position at the Albuquerque Reservations Center. Seven other candidates applied and ultimately Karla Hubbell, who had 15 years of leadership experience at another large company, was chosen for the position.

On March 21, 2006, Plaintiff was interviewed for the Assistant Concourse Manager position at the Phoenix Station. Three other candidates were also considered. However, Southwest claims the position was not filled due to an effort to control costs. Plaintiff claims he was "told" that the Assistant Concourse Manager position was not filled because it was upgraded to a Concourse Manager position.

On April 11, 2006, Plaintiff interviewed for the Manager of Ramp Training position at the Dallas station. Plaintiff was considered along with eight other candidates. Kimberly O'Connell ("O'Connell"), a manager in the Ground Operations Department in Dallas and a former Station Training Supervisor was chosen. Plaintiff believes that Chris Wahlenmaier ("Wahlenmaier"), Southwest's Vice President of Operations, may have been responsible for Plaintiff not getting the position. Plaintiff claims that during the interview, one of the interviewers received a phone call from Wahlenmaier. Shortly thereafter, the interview was terminated. Plaintiff suspects Wahlenmaier may have dashed his hopes for the promotion because Wahlenmaier had knowledge of a complaint Plaintiff made about Yarbrough in March, 2005.

With regard to all of the positions for which Plaintiff applied, Southwest claims Yarbrough's only input was his signing Plaintiff's IPAs. Plaintiff claims Yarbrough did in fact have input in the

7

selection process and that Yarbrough discriminated against him because Plaintiff is Hispanic and retaliated against him because Plaintiff complained about Davis and later complained to corporate about Yarbrough. As an example of Yarbrough's purported influence, Plaintiff claims Yarbrough received a call from an Assistant Manager of Southwest in Phoenix about an open position and the next time this position became available Plaintiff did not receive it. While he admits Yarbrough could not force another manager to promote an applicant, Plaintiff claims Yarbrough could "definitely influence" another manager by providing information and opinions about the applicant. Plaintiff further claims Yarbrough initially signed off on Plaintiff's IPAs for the positions of Operation Agent in Phoenix and Administration Clerk at the Albuquerque Reservation Center, but then made Plaintiff pull his applications and did not allow Plaintiff to interview for those positions.

Southwest claims that in April of 2006, Plaintiff told Yarbrough he needed to get closer to Albuquerque because of his wife's and mother's medical conditions. In fact, on April 24, 2006, Plaintiff wrote Yarbrough a memo which listed as the subject matter "relocate" and read:

> I appreciate all that you have done for me and all the experience I have gained from working with you. My wife has 3 out of 5 symptoms of MS that she would like to get treatment for in ABQ at UNMH. Her family lives there and would be able to assist with our three daughters ages 8, 7 and 5. This is my primary reason for wanting to relocate back to ABQ. I also have my mother who is needing assistance in many ways. She currently has been diagnosed with high blood pressure, high cholesterol, major hearing loss, and borderline Gloughcoma (sic) with (sic) has affected her eye sight. She lives by herself. If there is any way you can help me get to ABQ or closer city (PHX), it will be greatly appreciated by me and my whole family. I will take any position available. Thank you for your consideration.

(Pf. Depo., Ex. 9).

While Plaintiff admits he submitted the letter claiming he needed a transfer for medical reasons, he told Yarbrough shortly after his arrival at BNA about his wife being diagnosed as possibly having multiple sclerosis, but Yarbrough was totally apathetic and never asked about her

8

condition during the entire time that Plaintiff worked for him. Plaintiff claims that he submitted the request for transfer based upon medical reasons so that he would get way from Yarbrough.

Yarbrough advised Regional Director Frantell Plaintiff was looking for other positions and wanted to leave Nashville. Frantell told Yarbrough it was important that BNA have an MRO committed to Nashville since this was a critical position.

On April 20, 2006, Yarbrough and Venable asked Plaintiff what he intended to do. Plaintiff advised he was going to keep working in Nashville until something opened up in Albuquerque or a nearby city. Yarbrough told Plaintiff that was not an option because he needed a MRO in Nashville who was committed to Nashville.

Southwest claims Yarbrough and Venable contacted Southwest's stations in Albuquerque and Phoenix on Plaintiff's behalf to determine what positions were available and told Plaintiff there were positions available in both places. Plaintiff told them his preferences, in order, were ABQ Reservations, ABQ Ramp Supervisor, PHX Operations Agent, and PHX Ramp Supervisor. Plaintiff claims Yarbrough and Venable made no effort to place him into one of those positions, but instead were attempting to force him either to resign or take an entry level job in Phoenix. In fact, Plaintiff claims he knew of an open position for Ramp Supervisor in Albuquerque, but Yarbrough would not even allow him to apply for the position and instead forced him to take a Ramp Agent position in Phoenix. Plaintiff feared that if he did not take the position, he would be fired and so he agreed to take the Ramp Agent position in Phoenix.

After arrangements had been made for Plaintiff to transfer to Phoenix as Ramp Agent, Plaintiff approached Yarbrough about a position in Las Vegas. Yarbrough refused to sign the IPA

for that position because arrangements had already been made for Plaintiff to transfer to Phoenix, even though Plaintiff had yet to be given a start date in Phoenix.[5]

Plaintiff became a Ramp Agent in Phoenix on May 16, 2006. Plaintiff feels he was forced to take what amounted to a demotion because of his repeatedly seeking a transfer from Nashville.

## C. Specific Comments and Treatment

Plaintiff claims that during his tenure at BNA, he was subjected to improper comments. He also alleges he was treated differently than other managers.

### 1. Improper Comments

On one occasion, shortly after Plaintiff started working at BNA, Plaintiff was making a note on a piece of paper and Yarbrough made a comment to Plaintiff that he could have used a Post-it note and saved two cents. Plaintiff did not think Yarbrough was joking because Yarbrough did not smile when making the statement.

On another occasion, when Plaintiff was returning from the MIT I program, he spoke with a Southwest employee about the fact that Plaintiff's children only had two months off school for summer vacation, whereas the other employee's children had a three month vacation. Yarbrough, who was present, stated something to the effect of "well, you have to consider their genes."

On three occasions sometime before January 2006, Yarbrough asked Plaintiff if he was Mexican. Plaintiff told him no, he was Spanish.

On another occasions, Plaintiff was eating with Yarbrough, Venable, and Sullivan. Venable, who is originally from New Mexico, told Plaintiff that "I can't believe you're from New Mexico and

---

[5]Plaintiff admits that if he had applied for the position in Las Vegas, there was no guarantee he would have received it. He also admits that even if he received the position it may have been some time before he would have left Nashville.

10

you don't like chiles." While Plaintiff is unsure whether Venable had any ill intent in making the comment, he does complain that Yarbrough did not say anything to Venable about the comment.

On still another occasion, when Plaintiff was preparing to leave for Phoenix, Plaintiff, Yarbrough, and Venable were having a conversation during which Venable said she was jealous that Plaintiff was moving back to New Mexico as an agent. Yarbrough stated that he was not jealous that Plaintiff was moving to New Mexico, and Plaintiff viewed this as a comment relating to his national origin.[6]

Finally, Plaintiff complains that on several occasions as he and Yarbrough were walking through the freight area a freight agent said "there goes the neighborhood." That same agent also allegedly "mimicked Mexican speech patterns" in Plaintiff and Yarbrough's presence. Nevertheless, neither Plaintiff nor Yarbrough reprimanded this subordinate employee.

### 2. Different Treatment

As indicated, shortly after arriving in Nashville, Plaintiff began having problems with how the station was managed. In particular, Plaintiff believed that his boss, MRO Davis, was doing things that were contrary to directives from corporate. These included: Davis' lack of accountability and inability to address issues with subordinates; Davis allowing too much overtime; Davis' overspending, (including giving out $5 food coupons to employees, buying a new refrigerator for the breakroom, and buying the wrong chocks); and Davis' failure to properly handle union grievances. Plaintiff complained to Yarbrough and Yarbrough met with Plaintiff and Davis about

---

[6]Plaintiff acknowledges Yarbrough has a dry sense of humor and it might be difficult to determine whether Yarbrough was joking when he made a comment. Nevertheless, Plaintiff maintains that Yarbrough rarely joked with him and he did not have the type of relationship with Yarbrough which fostered joking.

these issues. Yarbrough perceived many of the issues to be the result of a difference in management style as between Plaintiff and Davis. With regard to the accountability issue, Plaintiff believed that Yarbrough agreed with him and asked Plaintiff to help Davis improve his accountability.

In March 2005, Plaintiff informed Yarbrough and Regional Director Mike Miller ("Miller") that he intended to resign due to his alleged bad-treatment at work and the stress it caused. He gave as his reasons for the decision Yarbrough allowing others to do what they pleased while keeping him "under a microscope." With regard to being "under a microscope," Plaintiff claimed Yarbrough would come into his office to check up on him and see what was going on, and Yarbrough once told Plaintiff he could have saved two cents by using a Post-it note, instead of a piece of paper when writing something down.

Between March 11, 2005 and March 14, 2005, Plaintiff had several communications with Miller and People Services Representative Frank Stockton ("Stockton") in which he voiced concerns about management and his treatment at BNA. Plaintiff said he was being treated less favorably than Davis, Yarbrough would not support Plaintiff in his promotion attempts and wanted Plaintiff to hold off in seeking promotions so Plaintiff could continue to do Yarbrough's "dirty work"; Yarbrough had a bad temper and cussed in front of Plaintiff and others; Davis was not being held accountable for his largesse; Yarbrough wanted Plaintiff to "fix" Davis; Davis failed to do anything when Plaintiff brought to Davis' attention a Ramp Supervisor who was sleeping in the office instead of doing his job; Davis did not reprimand an Operations Agent who was found sleeping in a jetway; Davis did not properly schedule employees; Davis did nothing when an employee complained about feeling threatened; Davis ordered items, even though Yarbrough told the managers not to order anything without his approval; Davis refused to train Plaintiff on the overtime checkbook; some

12

employees used the term "DANS" (an acronym for "dumb ass n****rs,") which Plaintiff had to take care of by calling People Services and telling the employees that such language would not be tolerated; Yarbrough told Davis and Plaintiff they better get along or he would have to get rid of one of them; Yarbrough made the comment about Plaintiff's children and their genes; and Plaintiff, Yarbrough and Davis had a meeting about accountability during which Yarbrough yelled at Plaintiff and told him not to use the word accountability again.

In a March 11, 2005 conversation, Plaintiff told Miller that all he wanted was for "this treatment" to stop. Miller told Plaintiff to think about his resignation over the weekend and see how he felt about it after the weekend. Miller told Plaintiff he was going to talk to Yarbrough. Miller also asked Plaintiff if he wanted to take a couple of days off, but Plaintiff declined.

After Miller spoke with Yarbrough, he returned to talk to Plaintiff and told Plaintiff Yarbrough had a dry sense of humor and had crossed the line. Some time later, Miller asked Plaintiff how things were going, and Plaintiff said "fine." Plaintiff claims, however, that the answer he gave Miller was not a real reflection of how his relationship with Yarbrough was going. Ultimately, Plaintiff chose not to resign in March 2005 and he was allowed to rescind his resignation.

Plaintiff claims that after his discussions with Miller, Yarbrough did not call Plaintiff on his cell phone for the next month or so. Yarbrough did, however, speak to Plaintiff in person during this time frame. Plaintiff also claims that after the discussions with Miller, Yarbrough would make faces at him.

Plaintiff also believes he was treated differently in that he was required to perform maintenance work. While Plaintiff admits Yarbrough, too, did some maintenance work, that work

13

was no where near the amount that Plaintiff performed.  In this regard, Plaintiff claims he repaired a clogged sink in the operations office; painted walls in the operations breakroom area; assisted Maintenance Manager Danny Derks ("Derks") with replacing ceiling tiles; and assisted with repairing a baggage belt.[7]  The maintenance work Plaintiff was performing stopped when he was promoted to the MRO position at BNA.

Plaintiff also believes Yarbrough treated Venable and Sullivan more favorably because he allowed them to run the Customer Services Department as they chose.  Yarbrough also allowed them to switch schedules as they desired.[8]

Plaintiff further claims Yarbrough would sometimes raise his voice at Plaintiff and point his finger at him.  Plaintiff does not know, however, whether Yarbrough also acted this way with other managers behind closed doors.

Finally, Plaintiff alleges he was treated differently in that his picture was not on Yarbrough's wall, while all of the other manager's pictures were on Yarbrough's wall.

## D.  Filing of EEOC Charges and Complaint

Based upon the foregoing events, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 1, 2006 (which he amended on November 25, 2006), claiming he was discriminated against because of Hispanic origin and retaliated against for having complained about his treatment.  Suit was filed in this Court on September 28, 2007 alleging a hostile work environment, discrimination, and retaliation in violation

---

[7]Plaintiff admits Derks would seek him out for assistance because Derks felt more comfortable with Plaintiff than the other managers and he knew Plaintiff would help him and would do a good job.

[8]Nevertheless, Plaintiff admits he and Davis occasionally traded shifts.

14

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Tennessee Human Rights Act ("THRA"), 4-21-101 et seq.

## II.  STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met.  See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986).  The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial.  If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e).  The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

15

### III. APPLICATION OF LAW

As indicated, Plaintiff claims he was subjected to a hostile work environment, subjected to discrimination, and retaliated against, while working at BNA. Those claims are brought under Title VII and the THRA. Prior to discussing those claims, the Court will address Defendant's Motion to Strike Plaintiff's Affidavit.

### A. Motion to Strike Plaintiff's Affidavit

Defendant seeks to strike Plaintiff's Affidavit (Docket Entry No. 15) which was filed in response to Defendant's Motion for Summary Judgment. Defendant argues that (1) the Affidavit is not based on personal knowledge as required by Rule 56(e) of the Federal Rules of Civil Procedure and Rule 602 of the Federal Rules of Evidence; and (2) through the Affidavit Plaintiff attempts to contradict his sworn deposition testimony. While the Court agrees that there are many objectionable statements contained in the Affidavit, including statements which obviously are not based on personal knowledge and statements which are in direct conflict with Plaintiff's deposition, the Court will not strike Plaintiff's Affidavit.

Motions to strike are disfavored. See, Heller Fin., Inc. v. Midwhey Powder Co., 883 F.2d 1286, 1294 (7th Cir. 1989). Such motions should be granted only "in extraordinary circumstances," such as where "the document is redundant, immaterial, impertinent, or scandalous and this document has caused some prejudice to the opposing party." Reyes v. Seaton Ent., LLC, 2008 WL 400452 at *6 (E.D. Tenn. 2008).

In setting forth the facts in this Memorandum, the Court has considered Plaintiff's Affidavit only to the extent that it is based on personal knowledge and sets forth facts which would otherwise be admissible in accordance with Rule 56(e) of the Federal Rules of Civil Procedure. Further, the

16

Court does not credit Plaintiff's Affidavit insofar as it directly contradicts his deposition testimony. See, Bilak-Thompson v. Dollar Tree Store, Inc., 2008 WL 2521230 *5 n.4 (6th Cir. 2008)(in ruling on summary judgment motion, court should ignore affidavit statements to the extent they directly contradict prior deposition testimony). Accordingly, the Motion to Strike Plaintiff's Affidavit will be denied.

## B. Title VII and Hostile Work Environment Claim

Defendant first moves to dismiss Plaintiff's Title VII hostile work environment claim on the ground that it is untimely. Defendant also argues there is no merit to Plaintiff's hostile work environment claim.

Under Title VII, in a deferral state such as Tennessee, a claimant must file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") within three hundred days of a discrete act of discrimination. Tartt v. City of Clarksville, 149 Fed. Appx. 456, 460 (6th Cir. 2005).[9] However, the Supreme Court has held that not all allegations supporting a hostile work environment claim need occur within the limitations period because such a claim is not tied to a discrete act:

> The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002).

---

[9] "While the 300-day bar is not jurisdictional, it does have the effect of a statute of limitations, and is not to be waived without good cause." Id.

17

In this case, Plaintiff filed his Charge of Discrimination on November 1, 2006, which means that to prevail on his Title VII hostile work environment claim under Morgan, at least one of the allegedly harassing acts must have occurred on  January 5, 2006 or after.  Even though Defendant specifically raised the argument in its Motion for Summary Judgment that no harassing conduct or statements were made after this date, Plaintiff has not pointed to a specific act which occurred after January 5, 2006 which would support a claim for a hostile work environment, but instead merely claims, in a wholly conclusory fashion, that he is entitled to pursue all of his claims on a continuing violations theory.  Since Plaintiff points to nothing which occurred within the limitations period, it would appear that his hostile work environment claim is untimely.  See, Weigel v. Baptist Hosp. of East Tenn., 302 F.3d 367, 376 (6th Cir. 2002)(citation omitted)("To establish a continuing violation, plaintiff must first produce evidence of a 'current' violation taking place within the limitations period").

Regardless of the timeliness of Plaintiff's claim, the summary judgment record fails to support a hostile work environment claim.  Based upon Plaintiff's deposition testimony, Defendant has identified the following items as the basis for Plaintiff's hostile work environment claim:

> (1) the comments Yarbrough made about Plaintiff's children's genes and asking Plaintiff if he was Mexican; (2) the comments the freight agent made about "there goes the neighborhood" and mimicking Mexican speech patterns; (3) Yarbrough's comments made about writing on a piece of paper instead of a Post-it note; (4) Yarbrough and/or Davis rejecting Plaintiff's suggestion that they write-up certain employees; and (5) Yarbrough raising his voice at Plaintiff when he and Plaintiff were behind closed doors.

(Docket Entry No. 9 at 8-9).  Plaintiff agrees these allegations constitute his hostile work environment claim with the following additions: (1) Yarbrough "intimidated" Plaintiff; (2) Yarbrough treated Plaintiff "differently than other supervisors"; (3)  Yarbrough referred to Plaintiff

18

as Mexican, even though he knew Plaintiff was Spanish; (4) Yarbrough failed to take action when the freight agent made his allegedly discriminatory comments; and (5) Yarbrough "made certain facial expressions toward" Plaintiff. (Docket Entry No. 15 at 11, ¶ 41).

A hostile work environment arises "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). "In order to establish a hostile work environment claim, an employee must show the following: 1) the employee is a member of a protected class, 2) the employee was subjected to unwelcome harassment, 3) the harassment was based on the employee's race, 4) the harassment affected a term, condition, or privilege of employment and 5) the employer failed to take reasonable care to prevent and correct any harassing behavior." Moore v. KUKA Welding Systems, 171 F.3d 1073, 1078-79 (6th Cir. 1999). Liability may be imposed where a supervisor engages in workplace harassment which leads to a tangible employment action, or where the employer fails to exercise reasonable care to prevent and correct known harassment by a co-worker. See, Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275 (1998); Burlington Industries Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257 (1998).

To determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances." Williams v. General Motors, 187 F.3d 553, 562 (6th Cir. 1999). The Court is also required to utilize both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive." Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000). "Appropriate factors for the

19

court to consider when determining whether conduct is severe or persuasive enough to constitute a hostile work environment 'include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. quoting Harris, 510 U.S. at 23.

In this case, when viewed in light of the totality of the circumstances, Plaintiff cannot show the allegedly harassing conduct was so pervasive or severe as to alter the conditions of his employment.  Most of the events about which he complains arguably do not relate to his protected status as an Hispanic.  This would include Yarbrough's comments about genes, telling Plaintiff he could save two cents by using a Post-it note, Yarbrough's making faces at Plaintiff and raising his voice, Yarbrough generally treating Plaintiff differently, Yarbrough's failure to write-up certain employees, and the freight agent's comment that "there goes the neighborhood" when two members of management approached his work area.  Other actions, such as asking whether Plaintiff was Mexican (when he knew Plaintiff was Spanish),  may properly be characterized as boorish behavior.  However, "merely unpleasant or boorish behavior is not prohibited by the law, Ptasnik v. City of Peoria, 93 Fed. Appx. 904, 909 (7th Cir. 2004), since "Title VII was not meant to create a 'general civility code[.]'" Clark v. United Parcel Service, Inc., 400 F.3d 341, 352 (6th Cir. 2005).  The freight agent's alleged "mimicking" of the Mexican language could certainly be viewed as hostile, but it must be remembered that the statement was made in Plaintiff's presence, yet Plaintiff did not take any action to discipline the subordinate employee which suggests Plaintiff did not subjectively find the comment offensive.

"While there is no bright-line rule as to what constitutes a hostile work environment, the plaintiff's allegations must depict conduct that could be construed as pervasive enough to alter the

20

conditions of h[is] employment and to create an abusive situation." Id. at 351. Based on the totality of the circumstances, and the type of comments which were made over a period of two and one-half years, the Court finds Plaintiff cannot show he was subjected to a hostile work environment at BNA. See, id., 400 F.3d at 351-52 (comparing cases where hostile work environment may be said to exist with those where the evidence showed no such environment). Accordingly, summary judgment will be granted on Plaintiff's Title VII hostile work environment claim.

## C. Title VII Race and National Origin/Race Discrimination Claim

Title VII's anti-discrimination provision makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff may establish a prima facie case of discrimination by showing (1) that he is a member of a protected group, (2) that he was qualified for the position at issue, and (3) that he was treated differently than comparable employees outside of the protected class." Dunlap v. Tennessee Valley Auth., 519 F.3d 626, 630 (6th Cir. 2008). A defendant may rebut a prima facie case by articulating a legitimate non-discriminatory reason for its treatment of the plaintiff. Id. at 631. Once an employer sets forth such a reason, the burden of production shifts to the plaintiff to show that the stated reason was in fact a pretext for discrimination. Id.

In his Complaint, Plaintiff makes broad and general allegations about discrimination based upon his race or national origin. In his deposition, Plaintiff was asked to identify what he believed to be the discriminatory acts by Southwest and he claimed the following: he did not receive promotions; he was "demoted" to a Ramp Agent position in Phoenix; he was not permitted to interview for positions for which he was qualified after April 24, 2006, when he agreed to take the

21

Ramp Agent position in Phoenix; he was subjected to certain derogatory comments; and he occasionally performed maintenance tasks while assigned at BNA.

### 1. Promotion Decisions

As already indicated, Title VII requires an employee in a deferral state to file a charge of discrimination within 300 days of the last discrete act, unless there is a continuing violation as recognized by the Supreme Court in <u>Morgan</u>. However, a failure to promote is a "discrete act" under <u>Morgan</u>, <u>El-Zabet v. Nissan North Amer., Inc.</u>, 211 Fed. Appx. 460, 464 (6th Cir. 2006), and therefore the continuing violations doctrine does not extend the 300-day filing period for failure to promote claims, <u>see</u>, <u>Gee v. Liebert Corp.</u>, 58 Fed. Appx. 146, 153 (6th Cir. 2003).

In this case, because Plaintiff first filed a charge of discrimination with the EEOC on November 1, 2006, his failure to promote claims are limited to positions for which he did not receive a promotion after January 5, 2006. This would include the Station Manager position at Albuquerque for which Plaintiff interviewed on February 23, 2006, the Center Leader position at the Albuquerque Reservation Center for which Plaintiff interviewed on March 7, 2006, the Assistant Concourse Manager position in Phoenix for which Plaintiff interviewed on March 21, 2006, and the Manager of Ramp Training at Dallas, for which Plaintiff interviewed on April 11, 2006.

With respect to each of these positions, Defendant does not contest whether Plaintiff can establish a prima facie case of discrimination, but instead points to legitimate non-discriminatory reasons for its decisions. In this regard, Defendants assert that, with respect to the Station Manager position in Albuquerque, the initial two applicants (which included Plaintiff) were rejected as not having the necessary qualifications and experience to assume a busy station like Albuquerque and instead Defendant transferred the Station Manager from Boise to that position. As for the Center

Leader position at the Albuquerque Reservation Center, Defendant asserts Plaintiff and seven other applicants were considered for the position, but an outside candidate who had 15 years of leadership experience with a large company was chosen. The Assistant Concourse Manager position at Phoenix was not filled as a cost saving measure. Finally, with respect to the Manager of Ramp Training at the Dallas station, Defendant chose the Manager of the Ground Operations Department who had been a Station Training Supervisor for the position over Plaintiff and seven other candidates.

"Hiring a more qualified candidate certainly suffices as a legitimate, nondiscriminatory rationale for denying [a] promotion." Williams v. Columbus Metro. Housing Auth., 90 Fed. Appx. 870, 874 (6th Cir. 2004). Further, elimination of a position is a legitimate non-discriminatory reason for failing to fill the position. See, Hopkins v. Electronic Data Sys. Corp., 196 F.3d 655, 664 (6th Cir. 1999). Because Defendant has met its burden of articulating a legitimate non-discriminatory reason for its decision in relation to each of these positions, the burden shifts to Plaintiff to show pretext.

In his response to the Motion for Summary Judgment, Plaintiff simply asserts the "non-discriminatory reasons Southwest gives for its actions are simply a pretext for discrimination." (Docket Entry No. 16 at 3). In his Affidavit, Plaintiff states he "believed" Yarbrough had a "direct impact" on Plaintiff not receiving the promotions and Yarbrough's actions were "motivated by his racism and retaliation." (Docket Entry No. 15 at 5, ¶ 19). However, Plaintiff offers not a shred of proof to support such assertions and ignores the fact that while Plaintiff was at BNA Yarbrough approved several pay raises for Plaintiff, signed numerous IPAs for Plaintiff, arranged for Plaintiff to be temporarily assigned to Philadelphia so that Plaintiff could beef up his experience, and

promoted Plaintiff to the MRO position at BNA.  Plaintiff also ignores his belief (which he repeats throughout his Affidavit) that, for allegedly selfish reasons, Yarbrough did not want Plaintiff to leave BNA.  This belief is wholly incongruous with Plaintiff's unsupported and conclusory assertion that Yarbrough harbored ill-will towards Plaintiff because of Plaintiff's race or national origin.

Plaintiff also asserts O'Connell had less leadership experience than him, but offers no proof for the assertion. Regardless, "an employee's evaluation of his own performance or qualifications is irrelevant as a matter of law," as is "plaintiff's 'perception of . . . the incompetence of those competing against him[.]'" Mynatt v. Lockheed Martin Energy, Sys., 271 Fed. Appx. 470, 477 (6th Cir. 2008)(quoting, Wrenn v. Gould, 808 F.2d 493, 602 (6th Cir. 1987)).

Plaintiff claims  he was "told" the Assistant Concourse Manager position in Albuquerque was not filled, but it was latter upgraded to a Concourse Manager position.  Again, Plaintiff offers no proof for this assertion.  In any event, the undisputed fact is that the position for which Plaintiff applied (i.e. Assistant Concourse Manager) was not filled and thus Defendant did not lie when it said Plaintiff was not chosen because the position was not filled.

"A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct."  Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000).  Plaintiff has failed to meet his burden of production on the question of pretext sufficient to present a jury question.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim that he was subjected to discrimination when he was not promoted.

### 2. Transfer Decision and Subsequent Applications

Plaintiff complains his transfer to a position as a Ramp Agent in Phoenix constitutes discrimination. He also claims Yarbrough discriminated against him when he failed to support Plaintiff's applications for other positions which were submitted after the decision to transfer Plaintiff had been made.

Plaintiff's present suggestion that Yarbrough forced him to take the Ramp Agent position is not supported by the record and is revisionist history. Recall that Plaintiff gave Yarbrough a letter in which he thanked Yarbrough for all he had done over the past two years and unequivocally stated that he wanted to transfer to any position in Albuquerque or Phoenix so that his wife could get treatment for her medical condition and because his mother was in ill health. There is simply no evidence that the real reason Plaintiff took the position as Ramp Agent was based upon some animus by Yarbrough towards Plaintiff's Hispanic origin.

On January 1, 2006, Yarbrough (who brought Plaintiff to BNA) promoted Plaintiff to the position of MRO. That promotion gave Plaintiff a significant pay increase and provided him with stock options. Within 6 weeks of this promotion, Plaintiff applied for positions at other stations and, in the seven-week period between February 23, 2006, and April 11, 2006, Plaintiff flew to four different locations to interview for other positions. Those sojourns obviously took him away from his new responsibilities as MRO at BNA and, understandably, Southwest became frustrated with Plaintiff. Southwest wanted Plaintiff to either commit to his position at BNA or move elsewhere.

Once Plaintiff indicated his intention to move back to the Southwest, Yarbrough and Venable arranged with the Phoenix Station Manager to allow Plaintiff to transfer there as soon as possible as a Ramp Agent. The arrangement was made on April 25, 2006. Nevertheless, Plaintiff

Case 3:07-cv-00975   Document 24   Filed 10/28/08   Page 25 of 30 PageID #: 635

approached Yarbrough and Venable to seek their support in applying for a different position in Las Vegas. Both refused to sign Plaintiff's IPA or support his request because arrangements had already been made for Plaintiff to go to Phoenix and they needed to get someone into the MRO position who was committed to stay in Nashville.

Given this factual background, Southwest has established legitimate non-discriminatory reasons both for the transfer to Phoenix and Yarbrough's and Venable's refusals to support Plaintiff's request to transfer elsewhere. Plaintiff has not shown these reasons to be pretextual. Nor has he shown Defendant engaged in discrimination since he received exactly what he requested in writing – a transfer to Phoenix, regardless of the position. Thus, Defendant is entitled to summary judgment on these claims.

### 3. Other Claims

Plaintiff claims discrimination due to the comments made to him and the overall treatment he received, as well as the fact that he performed maintenance tasks while at BNA. As already indicated, such claims are untimely in that Plaintiff has presented no competent evidence suggesting any of the derogatory comments were made after January 5, 2006. Further, Plaintiff admits he did not perform maintenance work after he was promoted to MRO effective January 1, 2006.

In any event, Plaintiff has not shown that he was treated materially differently than other employees. More importantly, Plaintiff has not shown any difference in treatment as a result of his Hispanic origin.

Further, to establish a prima facie case of discrimination, Plaintiff must show he was subjected to an adverse employment action. <u>Russell v. Univ. of Toledo</u>, 537 F.3d 596, 604 (6th Cir. 2008). Plaintiff has not done so with respect to the alleged derogatory comments or the fact that

Plaintiff helped Derks perform maintenance work, particular since Plaintiff admits that his boss also performed maintenance work. Summary judgment will be granted on these claims as well.

**D.  Title VII Retaliation Claim**

A burden of production framework similar to that used to analyze discrimination claims is employed to assess retaliation claims. Plaintiff must first establish a prima facie case by showing: (1) he engaged in protected activity; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action. Morris v. Oldham County Fiscal Court, 201 F.3d 784, 791 (6th Cir. 2000)(emphasis omitted). "If and when a plaintiff has established a *prima facie* case, the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." Id. at 792-93 (citation omitted). "The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate 'that the proffered reason was not the true reason for the employment decision.'" Id. at 793 (citation omitted).

Defendant first seeks summary judgment on the ground that Plaintiff did not engage in protected activity. In light of the Supreme Court's decision to grant certiorari in Crawford v. Metro. Gov't. of Nashville and Davidson County, 128 S.Ct. 1118 (2008), the Sixth Circuit in Pretchel v. Kellogg's, 270 Fed. Appx. 379, 381 (6th Cir. 2008) held that it might be possible for an employee to establish he or she engaged in a protected activity where that activity involved participating in an internal company investigation, even where no charges are pending before the EEOC. Even so, the employer must be placed on notice the employee is complaining about unlawful discrimination.

In this case, Plaintiff alleges he engaged in protected activity when he complained to Miller and Stockton in March 2005. However, those complaints would not place a reasonable employer on notice that Plaintiff was complaining about unlawful discrimination against him because he was Hispanic. Instead, Plaintiff aired numerous complaints about the perceived lack of accountability at BNA, and such things as Yarbrough raising his voice, Plaintiff and Davis being at odds on many issues, and Yarbrough not fully supporting Plaintiff's quests for promotion. Merely complaining about unfair treatment, without some link to a protected status, does not constitute protected activity. Fox v. Eagle Distrib. Co., 510 F.3d 587, 591 (6th Cir. 2007).

Regardless, to establish his retaliation claim, Plaintiff must show a materially adverse action. Plaintiff's claims that Yarbrough raised his voice at him, that Yarbrough failed to call on his cell phone for several months, that Yarbrough did not have Plaintiff's picture on the wall, and that Yarbrough made faces at him do not suffice. An adverse employment action in the retaliation context consists of an action which would dissuade a reasonable worker from making or supporting a charge of discrimination. Burlington Northern & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2415 (2006). "Trivial episodes of unpleasantness or admonition, or other de minimis employment actions, standing alone, cannot supply legally sufficient evidence of actionable material discipline or retaliation, even if they were arguably impelled by protected activity." Kelly v. Lambda Research, Inc.. 89 Fed. Appx. 535, 545 (6th Cir. 2004)(collecting cases). While a company may be liable for retaliation where a supervisor engages in severe or pervasive retaliatory harassment, see, Michael v. Caterpillar Fin. Serv. Corp., 496 F.3d 584, 595 (6th Cir. 2007), that has not been shown to have existed in this case.

The only arguably adverse action in this case is Plaintiff's claimed "demotion" to Ramp Agent in Phoenix. Leaving aside how that came about, Plaintiff cannot establish his retaliation claim because there is no temporal proximity between his making his complaint in March 2005 and his "demotion" more than a year later. See, Nguyen v. City of Cleveland, 229 F.3d 559, 566 (6th Cir. 2000)(generally, mere temporal proximity between protected activity and adverse action not sufficient to establish retaliation). In between these events, the evidence is undisputed that Plaintiff received two pay raises; Yarbrough supported Plaintiff in a temporary assignment at PHL designed to increase Plaintiff's chances for future promotions; Yarbrough signed many IPAs at Plaintiff's request; and Yarbrough promoted Plaintiff to the MRO position at BNA. These actions are not those of a person acting with retaliatory animus. Accordingly, Defendant will be granted summary judgment on Plaintiff's Title VII retaliation claim.

**E. THRA Claims**

Based on the foregoing, Plaintiff cannot prevail on his claims under the THRA since the analysis for THRA claims is the same as that under Title VII. Frizell v. Southwest Motor Freight, 154 F.3d 641, 646-47 (6th Cir. 1998); Campbell v. Florida Steel Corp., 919 S.W.2d 26, 31 (Tenn.1996)). Moreover, Plaintiff's claims under the THRA are time-barred.

A claim under the THRA must be made within "one year after the alleged discriminatory practice ceases." T.C.A. § 4-21-311(d). In this case, Plaintiff filed his Complaint in this Court on September 28, 2007. However, Plaintiff was transferred to Phoenix effective May 16, 2006, and his only claims against Southwest relate to the alleged treatment he received at BNA. Accordingly, any claims under the THRA are barred by the one year limitations period.

29

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Defendant Southwest's Motion for Summary Judgment (Docket Entry No. 9) will be granted and this case will be dismissed with prejudice. Defendant's Motion to Strike Plaintiff's Affidavit (Docket Entry No. 20) will be denied.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE